JMK:MTK/DG
F. #2017R01904

FILED
CLERK

2018 MAR 20   AM 3: 59

U.S. DISTRICT COURT
EASTERN DISTRICT
OF NEW YORK

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - against -

PANAYIOTIS KYRIACOU,
        also known as "Peter Kyriacou,"
ARVINSINGH CANAYE,
        also known as "Vinesh Canaye,"
ADRIAN BARON,
LINDA BULLOCK,
ARISTOS ARISTODEMOU,
MATTHEW GREEN,
BEAUFORT SECURITIES LTD,
BEAUFORT MANAGEMENT SERVICES LTD,
LOYAL BANK LTD and
LOYAL AGENCY AND TRUST CORP.,

           Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

S U P E R S E D I N G
I N D I C T M E N T

Cr. No. 18-102 (S-1) (KAM)
(T. 18, U.S.C., §§ 371, 981(a)(1)(C),
982(a)(1), 982(b)(1), 1956(h) and
3551 et seq.; T. 21, U.S.C.,
§ 853(p); T. 28, U.S.C., § 2461(c))

THE GRAND JURY CHARGES:

INTRODUCTION

       At all times relevant to this Superseding Indictment, unless otherwise indicated:

I.    Background

    A.    The Corporate Defendants

        1.    The defendant BEAUFORT SECURITIES LTD ("BEAUFORT

SECURITIES") was a broker-dealer and investment management company located in London,

United Kingdom.  BEAUFORT SECURITIES marketed itself on its website as a fully licensed

broker-dealer, regulated by the United Kingdom's Financial Conduct Authority ("FCA"), which

serviced both institutional investors and private clients.  Among other services, BEAUFORT

SECURITIES executed securities trades in the United States on behalf of its clients and then received the proceeds of those sales in its clients' brokerage accounts in the United Kingdom. BEAUFORT SECURITIES was registered with the Internal Revenue Service ("IRS") as a Foreign Financial Institution ("FFI") under the Foreign Account Tax Compliance Act ("FATCA").

2.       The defendant BEAUFORT MANAGEMENT SERVICES LTD ("BEAUFORT MANAGEMENT") was an off-shore management company with its principal place of business in Ebene, Mauritius.  BEAUFORT MANAGEMENT marketed itself on its website as providing, inter alia, the following services:  (a) off-shore company formation; (b) the provision of nominee shareholders and directors; (c) compliance and audit services; and (d) bank account opening services.  BEAUFORT MANAGEMENT was registered with the IRS as an FFI under FATCA.

3.       The defendant LOYAL BANK LTD ("LOYAL BANK") was an off-shore bank with offices located in Saint Vincent and the Grenadines and Budapest, Hungary.  LOYAL BANK held an off-shore banking license from the Financial Services Authority of Saint Vincent and the Grenadines.  LOYAL BANK marketed itself on its website as an internet-based multi-currency private bank specializing in wealth management, private banking and investment banking for individuals and corporations.  In or about 2014, LOYAL BANK registered with the IRS as an FFI under FATCA.  In connection with LOYAL BANK's registration as an FFI, the defendant ADRIAN BARON was listed as LOYAL BANK's "Responsible Officer."

4.       The defendant LOYAL AGENCY AND TRUST CORPORATION ("LOYAL AGENCY") was an off-shore management company located in Saint Vincent and the Grenadines.  LOYAL AGENCY marketed itself on its website as providing, inter alia, the

following services: (a) off-shore company formation; (b) the provision of nominee shareholders; and (c) trust and foundation formation. In or about 2014, LOYAL AGENCY registered with the IRS as an FFI under FATCA. In connection with LOYAL AGENCY's registration as an FFI, the defendant ADRIAN BARON was listed as LOYAL AGENCY's "Responsible Officer."

   B.  The Individual Defendants

     5.  The defendant PANAYIOTIS KYRIACOU, also known as "Peter Kyriacou" (hereinafter, "PETER KYRIACOU"), a citizen of the United Kingdom, was employed as an investment manager at BEAUFORT SECURITIES and worked at BEAUFORT SECURITIES' office in London, United Kingdom.

     6.  The defendant ARVINSINGH CANAYE, also known as "Vinesh Canaye" (hereinafter, "VINESH CANAYE"), a citizen of Mauritius, was employed as the General Manager of BEAUFORT MANAGEMENT and worked at BEAUFORT MANAGEMENT's office in Ebene, Mauritius.

     7.  The defendant ADRIAN BARON, a citizen of the United Kingdom and Saint Vincent and the Grenadines, was employed as the Chief Business Officer of LOYAL BANK and a Director of LOYAL AGENCY. BARON primarily worked at LOYAL BANK's office in Budapest, Hungary. Prior to being Chief Business Officer, BARON had been employed as the Chief Executive Officer of LOYAL BANK between approximately 2006 and 2014.

     8.  The defendant LINDA BULLOCK, a citizen of the United Kingdom and Saint Vincent and the Grenadines, was employed as the Chief Executive Officer of LOYAL BANK and a Director of LOYAL AGENCY. BULLOCK primarily worked at LOYAL BANK's office in Saint Vincent and the Grenadines. Prior to being Chief Executive Officer, BULLOCK

3

had been employed as LOYAL BANK's Head of Compliance between approximately 2004 and 2014.

9.     The defendant MATTHEW GREEN, a citizen of the United Kingdom, was the owner of Mayfair Fine Art Limited, located in London, United Kingdom.

10.     The defendant ARISTOS ARISTODEMOU, a citizen of the United Kingdom, was a real estate developer in London, United Kingdom. ARISTODEMOU is the uncle of the defendant PETER KYRIACOU.

II.     Relevant Regulatory Principles and Definitions

11.     FATCA was a federal law that required FFIs to identify their U.S. customers and annually report information (the "FATCA Information") about financial accounts held by U.S. taxpayers either directly or through a foreign entity. These accounts included personal and non-personal accounts held by one or more U.S. persons or entities in which one or more U.S. persons held a substantial ownership or controlling interest. FATCA's primary aim was to prevent U.S. taxpayers from using foreign accounts to facilitate the commission of federal tax offenses.

12.     An International Business Corporation or Global Business Corporation ("IBC" or "GBC") was an off-shore company, formed under the laws of a foreign jurisdiction, which was not permitted to engage in business within the jurisdiction in which it was incorporated. An owner of an IBC or GBC could deposit money and transfer stock to that entity to facilitate banking and securities trading activities while maintaining a level of anonymity for the owner because the IBC or GBC ownership records were typically not publicly available.

13.     The term "beneficial owner" was defined under the rules of the U.S. Securities and Exchange Commission ("SEC"). It included any person who directly or indirectly

4

shared voting power or investment power (for example, the power to sell a security). When a person or group of persons acquired beneficial ownership of more than five percent of a voting class of a company's equity securities registered under Section 12 of the Securities Exchange Act of 1934, they were required to file a Schedule 13D, which listed the acquisitions and other information, with the SEC, within 10 days of the purchase. The schedule was filed with the SEC and was provided to the company that issued the securities and each exchange on which the security was traded. Any material changes in the facts contained in the schedule required a prompt amendment.

14.     The term "nominee" in the securities fraud context referred to a person or firm into whose name securities or other properties were transferred in order to facilitate transactions, while concealing the customer as the actual owner. A "nominee account" was a type of account in which a stockbroker held shares belonging to clients in the name of an entity or another individual other than the actual owner. The use of nominees and nominee accounts was designed to conceal the true ownership interest of the customer.

15.     "Microcap" or "penny" stocks referred to stocks of publicly traded U.S. companies that had a low market capitalization. Microcap stocks were routinely traded on over-the-counter markets. Microcap stocks were often subject to price manipulation because they were thinly traded and subject to less regulatory scrutiny than stocks that traded on notable exchanges. Additionally, large blocks of microcap stock were often controlled by a small group of individuals, which enabled those in the group to control or orchestrate manipulative trading in those stocks.

16.     Wash trades were purchases and sales of securities that matched each other in price, volume and time of execution, and involved no change in beneficial ownership. For

5

example, a wash trade took place when Investor A bought 100 shares at $5.00 per share of Company A through Broker A, while simultaneously selling 100 shares at $5.00 per share of Company A through Broker B. Match trades were similar to wash trades but involved a related third person or party who placed one side of the trade. For example, a match trade took place when Investor A bought 100 shares at $5.00 per share of Company A through a broker, while Investor B, who coordinated with Investor A, simultaneously sold 100 shares at $5.00 per share of Company A through a broker. Both wash trades and match trades were used to create the appearance that the stock price and volume rose as a result of genuine market demand for the securities.

17.     A "pump and dump" or a "share ramping" scheme was a scheme where a group of individuals who controlled the free trading or allegedly unrestricted shares, also referred to as the "float," of a microcap company fraudulently inflated the share price and trading volume of the targeted public company through, inter alia, wash and matched trades, false and misleading press releases and paid stock promotions. When the target company's share price reached desirable levels, the individuals sold their free trading shares for substantial financial gain.

III.     The Fraudulent Schemes

18.     In or about and between March 2014 and February 2018, the defendants PETER KYRIACOU, VINESH CANAYE, BEAUFORT SECURITIES LTD and BEAUFORT MANAGEMENT SERVICES LTD, together with others, devised and engaged in a scheme whereby they agreed to defraud investors and potential investors in various U.S. publicly traded companies through, inter alia, fraudulent concealment of their clients' true beneficial ownership interests in the various U.S. publicly traded companies, and the engineering of artificial price movements and trading volume in the stocks of the various U.S. publicly traded companies.

6

19.     In or about and between January 2011 and February 2018, the defendants PETER KYRIACOU, VINESH CANAYE, ADRIAN BARON, LINDA BULLOCK, BEAUFORT SECURITIES LTD, BEAUFORT MANAGEMENT SERVICES LTD, LOYAL BANK LTD and LOYAL AGENCY AND TRUST CORP., together with others, devised and engaged in a scheme whereby they agreed to launder money by facilitating financial transactions to and from the United States, which transactions involved securities fraud proceeds and property represented to be proceeds of fraud in the sale of securities.

20.     In or about and between October 2017 and February 2018, the defendants PETER KYRIACOU, ARISTOS ARISTODEMOU and MATTHEW GREEN, together with others, devised and engaged in a scheme whereby they agreed to launder money by facilitating financial transactions to and from the United States, which transactions involved property represented to be proceeds of fraud in the sale of securities.

21.     In or about and between August 2016 and February 2018, the defendants PETER KYRIACOU and VINESH CANAYE, together with others, devised and engaged in a scheme whereby they agreed to defraud the United States by facilitating their clients' efforts to impede, impair, obstruct and defeat the lawful governmental functions of the IRS in the ascertainment, computation, assessment and collection of revenue, specifically, failing to comply with FATCA.

22.     In or about and between May 2017 and February 2018, the defendants ADRIAN BARON and LINDA BULLOCK, together with others, devised and engaged in a scheme whereby they agreed to defraud the United States by facilitating their clients' efforts to impede, impair, obstruct and defeat the lawful governmental functions of the IRS in the

7

ascertainment, computation, assessment and collection of revenue, specifically, failing to comply with FATCA.

A.    BEAUFORT SECURITIES

23.    In or about March and April 2014, law enforcement agents were investigating multiple Belize-based brokerage firms involved in various market manipulation schemes (the "Belize Investigation"). As part of the Belize Investigation, a judicially authorized wiretap revealed that an off-shore corrupt broker who managed one of the Belize-based brokerage firms ("Corrupt Broker-1"), an individual whose identity is known to the Grand Jury, was executing manipulative trades of a U.S. publicly traded stock through BEAUFORT SECURITIES.

24.    During an April 29, 2014 call, Corrupt Broker-1 informed a co-conspirator that he was winding down his off-shore brokerage firm and was in the process of transferring certain client accounts to BEAUFORT SECURITIES.

25.    In or about March 2016, following an investigation, the FCA found that the financial crime controls and anti-money laundering processes of BEAUFORT SECURITIES were deficient. In or about July 2016, the Chief Executive Officer of BEAUFORT SECURITIES affirmed to the FCA that BEAUFORT SECURITIES had completed remedial actions to correct the deficiencies identified by the FCA.

26.    Notwithstanding these representations to the FCA, after July 2016, BEAUFORT SECURITIES continued to facilitate market manipulation schemes, including executing sizable trades in pump and dump schemes involving at least 10 U.S. publicly traded stocks. These trades were executed in the United States at the direction of BEAUFORT SECURITIES on behalf of its clients, and the proceeds of those trades were subsequently received

in client accounts at BEAUFORT SECURITIES.  The trades resulted in proceeds of more than $50 million dollars to BEAUFORT SECURITIES' clients.

B.     The Undercover Operation: BEAUFORT SECURITIES and PETER KYRIACOU

27.     On or about August 28, 2016, a Belizean citizen, acting as a confidential source ("CS-1"), emailed BEAUFORT SECURITIES at info@beaufortsecurities.com and requested information regarding the opening of a brokerage account at BEAUFORT SECURITIES.  In response, on or about September 1, 2016, the defendant PETER KYRIACOU emailed CS-1 and provided his telephone number to arrange a call to discuss the opening of a brokerage account at BEAUFORT SECURITIES.

28.     Throughout September 2016, CS-1 placed a series of consensually recorded telephone calls to the defendant PETER KYRIACOU to discuss the opening of brokerage accounts at BEAUFORT SECURITIES.  In these communications, CS-1 advised KYRIACOU that he represented wealthy U.S. citizens who wanted to deposit stock with BEAUFORT SECURITIES.  KYRIACOU informed CS-1 that BEAUFORT SECURITIES did not open accounts in the names of U.S. citizens because of tax reasons.  CS-1 responded that his clients planned on opening accounts in the name of Belizean off-shore entities using Belizean nominees as shareholders, and that no U.S. citizens would appear on any of the account paperwork. KYRIACOU advised CS-1 that this arrangement would be acceptable to BEAUFORT SECURITIES.

29.     Beginning in or about October 2016, a law enforcement agent posing as an associate of CS-1 (the "Undercover Agent"), while located in the Eastern District of New York, placed consensually recorded telephone calls to the defendant PETER KYRIACOU and stated, in part, that he was interested in opening multiple brokerage accounts at BEAUFORT SECURITIES

from which to execute trades in several multi-million dollar stock manipulation deals involving

stocks traded on U.S. over-the-counter markets. The Undercover Agent advised KYRIACOU that

he was a U.S. citizen and that the purpose of opening multiple accounts at BEAUFORT

SECURITIES was, in part, to conceal his ownership interest in the companies' stock from the

SEC. KYRIACOU responded, in part, "we can't actually, um, deal with U.S. citizens, due to tax

laws." The Undercover Agent then advised KYRIACOU that the accounts would be opened

using Belizean IBCs controlled by the Undercover Agent and that no U.S. citizens would appear

on any of the account opening documents. KYRIACOU then agreed, in principle, that the

Undercover Agent could open brokerage accounts at BEAUFORT SECURITIES.

   30. On or about November 30, 2016, the Undercover Agent and CS-1 met with

the defendant PETER KYRIACOU at BEAUFORT SECURITIES' office in London. The

meeting was consensually recorded. During this meeting, the Undercover Agent further

explained the stock manipulation deals in which he planned to participate and his intent to use

brokerage accounts at BEAUFORT SECURITIES to execute manipulative trades in furtherance

of those deals. The Undercover Agent emphasized that, because he was a U.S. citizen, his name

could not appear on any of the paperwork associated with his brokerage accounts. To that end,

KYRIACOU recommended putting CS-1's name on the account paperwork as the beneficial

owner, notwithstanding that the Undercover Agent had informed KYRIACOU that he would be

the true beneficial owner of the accounts and would be exercising full control over them. The

Undercover Agent once again advised KYRIACOU that his brokerage accounts at BEAUFORT

SECURITIES would be opened in the name of Belizean nominees, including CS-1.

   31. During the November 30, 2016 meeting, the defendant PETER

KYRIACOU introduced the Undercover Agent and CS-1 to multiple BEAUFORT SECURITIES

employees, including a senior member of the compliance team ("Compliance Officer-1"), an individual whose identity is known to the Grand Jury. KYRIACOU informed Compliance Officer-1 that the Undercover Agent was from the United States and was interested in opening brokerage accounts at BEAUFORT SECURITIES. During the meeting, Compliance Officer-1 reviewed various account opening documents for the Undercover Agent's brokerage accounts. The documents included a form that defined FATCA and stated that "its primary aim is to prevent U.S. taxpayers from using accounts held outside the U.S[.] for tax evasion." The form further stated, in part: "This form is to be completed by the Signatory/Power of Attorney and where there are more than one beneficial owners; each beneficial owner is required to complete a separate FATCA . . . form." Neither this form nor any of the other account opening documents referenced the Undercover Agent. Compliance Officer-1 did not object to opening brokerage accounts at BEAUFORT SECURITIES for the Undercover Agent.

32.     During the same meeting, the defendant PETER KYRIACOU also introduced the Undercover Agent to the Chief Executive Officer of Beaufort Asset Clearing Services Ltd ("Executive-1"), an individual whose identity is known to the Grand Jury. Beaufort Asset Clearing Service Ltd is an affiliate of BEAUFORT SECURITIES that provided clearing services for BEAUFORT SECURITIES. The Undercover Agent explained to Executive-1 that he traded on the U.S. over-the-counter markets, at which time Executive-1 directed KYRIACOU to introduce the Undercover Agent to two BEAUFORT SECURITIES traders who had experience in U.S. over-the-counter market trading. KYRIACOU also stated that one of the BEAUFORT SECURITIES traders traded in the U.S. over-the-counter markets "on a daily basis."

33.     In or about January 2017, BEAUFORT SECURITIES opened six brokerage accounts for the Undercover Agent in the name of his Belizean IBCs. Belizean

11

nominees were listed as the beneficial owners of those brokerage accounts. Notwithstanding the

Undercover Agent's actual beneficial ownership of the accounts, at no time did BEAUFORT

SECURITIES request FATCA Information from the Undercover Agent.

34.     In or about January 2017, the defendant PETER KYRIACOU suggested

that he communicate with the Undercover Agent using WhatsApp. WhatsApp was an instant

messaging application on cellular phones that allowed for sending and receiving messages and

attachments that were secured by end-to-end encryption, which limited the ability of third parties,

including law enforcement, to read them.

35.     On or about April 26, 2017, the Undercover Agent met with the defendant

PETER KYRIACOU in London to discuss, inter alia, opening additional brokerage accounts at

BEAUFORT SECURITIES. The meeting was consensually recorded. During this meeting, the

Undercover Agent once again described his participation in multiple market manipulation deals.

KYRIACOU again advised the Undercover Agent that BEAUFORT SECURITIES did not accept

U.S. citizens as clients, but that there were "ways around it," including the use of CS-1 and other

nominees to open accounts. KYRIACOU stated, in part, that the Undercover Agent's name

would not appear on any account documents, notwithstanding that the Undercover Agent had

informed KYRIACOU that he would be the true beneficial owner of the accounts.

36.     At this meeting, the defendant PETER KYRIACOU and the Undercover

Agent also discussed how they would communicate regarding future stock trading to facilitate the

stock manipulation deals. KYRIACOU and the Undercover Agent agreed to communicate using,

among other methods, email addresses designed to hide the Undercover Agent's true identity.

37.     In or about June 2017, the Undercover Agent placed a series of

consensually recorded calls from the Eastern District of New York to the defendant PETER

KYRIACOU in London.  In one call, on or about June 16, 2017, KYRIACOU advised the

Undercover Agent that BEAUFORT SECURITIES had received approximately $250,000 that the

Undercover Agent had wired from the U.S. into his brokerage accounts at BEAUFORT

SECURITIES.  The Undercover Agent informed KYRIACOU that the money was proceeds of a

previous stock manipulation deal during which he had utilized a different brokerage firm.  The

Undercover Agent then requested that KYRIACOU execute multiple stock transactions to "clean

up the money" and "break the trail" from the previous stock manipulation deal.  Specifically, the

Undercover Agent requested that KYRIACOU purchase $100,000 worth of a Financial Times

Securities 100 Index stock ("FTSE Stock A") listed on the London Stock Exchange.  Shortly

after KYRIACOU purchased FTSE Stock A, the Undercover Agent requested that KYRIACOU

sell the shares of FTSE Stock A.  The Undercover Agent also requested that KYRIACOU

purchase $150,000 worth of two additional FTSE stocks listed on the London Stock Exchange

("FTSE Stock B" and "FTSE Stock C") and thereafter sell FTSE Stock B and FTSE Stock C to

disguise the source of those funds.  KYRIACOU executed each of the requested transactions.

   38. In another call, on or about June 23, 2017, the defendant PETER

KYRIACOU and the Undercover Agent discussed the mechanics of the stock manipulation deals.

KYRIACOU advised the Undercover Agent that "as we said from day one, when we look to

liquidate the stock we [do] it slowly, slowly."  The Undercover Agent advised KYRIACOU not to

worry because he had been "getting around" the SEC for "twenty-something years."

   39. During a meeting on or about December 12, 2017, the defendant PETER

KYRIACOU discussed match trades with the Undercover Agent.  KYRIACOU stated, in part:

"Say if you have your guy on the other side, who will match with us, we can match with him –

from our side." KYRIACOU explained that this kind of trading was "standard practice every single day."

  40. In furtherance of the stock manipulation deals, the defendants PETER KYRIACOU and BEAUFORT SECURITIES facilitated the manipulation of trading in the stock of HD View 360, Inc., a publicly traded U.S. microcap company that traded under the ticker symbol HDVW. Specifically, on or about January 25, 2018, the Undercover Agent called the defendant PETER KYRIACOU and advised him that he would need to conduct a series of match trades to facilitate the fraudulent manipulation of the price and trading volume of the company's shares. KYRIACOU agreed to execute these match trades. On or about January 31, 2018, KYRIACOU and BEAUFORT SECURITIES executed a match trade of HDVW stock.

  C. BEAUFORT MANAGEMENT and VINESH CANAYE

  41. In or about April 2017, the defendant PETER KYRIACOU advised the Undercover Agent that BEAUFORT MANAGEMENT, located in Mauritius, could assist the Undercover Agent in the formation of additional off-shore corporations. In a July 6, 2017 email, KYRIACOU introduced the Undercover Agent to the defendant VINESH CANAYE, BEAUFORT MANAGEMENT's General Manager. KYRIACOU also included a Director of BEAUFORT MANAGEMENT on the email. In the email, KYRIACOU stated that CANAYE "runs our Mauritius operation," and that KYRIACOU had "briefly explained [to CANAYE] what [the Undercover Agent is] looking for," and further explained that, "what [CANAYE] said to me fits in with what [the Undercover Agent is] looking for."

  42. On or about October 17, 2017, the Undercover Agent met with the defendant VINESH CANAYE in London. The meeting was consensually recorded. At that meeting, the Undercover Agent detailed his involvement in stock manipulation deals and, more

specifically, how "friendly" U.S.-based brokers with discretionary customer accounts purchased stock at the direction of the Undercover Agent in return for a 40 percent "kickback." During this conversation, CANAYE stated, in part, that the brokers "play with the value of the securities."

43.    During this same meeting, the Undercover Agent stated: "There are so many opportunities here. Listen. As long as you keep the Securities and Exchange Commission, the FBI, the Mauritian Secret Police, keep them off my back, keep me safe, we're gonna do some serious business." The defendant VINESH CANAYE responded, "I need to keep you safe, to be safe myself."

44.    On or about November 15, 2017, the Undercover Agent placed a consensually recorded call from the Eastern District of New York to the defendant VINESH CANAYE. The Undercover Agent advised CANAYE that he had previously utilized off-shore companies to conceal his ownership interest in various companies' stock to circumvent SEC reporting requirements. In response, CANAYE informed the Undercover Agent that BEAUFORT MANAGEMENT's GBCs utilized Mauritian corporations to act as nominee shareholders and directors. CANAYE further explained that he would personally sign documents on behalf of the GBCs and that the Undercover Agent's name would not appear on any company documents. Instead, CS-1 would be listed as the beneficial owner of the GBCs. CANAYE previously informed the Undercover Agent that he had set up similar structures for a client who traded in over-the-counter markets.

45.    During this same conversation, the Undercover Agent also informed the defendant VINESH CANAYE that he needed ways to pay corrupt stock brokers in the United States without those payments being linked to the stock manipulation deals. To that end, CANAYE informed the Undercover Agent that BEAUFORT MANAGEMENT's off-shore

companies could assist in generating fraudulent documentation to conceal the source of funds being paid to the corrupt U.S. brokers.

46.     In or about January 2018, the defendant VINESH CANAYE and BEAUFORT MANAGEMENT opened six GBCs for the Undercover Agent.  CS-1 was listed as the beneficial owner of the GBCs.  The Undercover Agent's name did not appear on any of the GBC opening documents.  At no time did CANAYE or BEAUFORT MANAGEMENT request FATCA Information from the Undercover Agent.

D.     The Laundering of Money through the Purchase and Sale of Art

47.     On or about October 19, 2017, the Undercover Agent met in London with a co-conspirator ("Co-Conspirator-1"), an individual whose identity is known to the Grand Jury, and the defendants PETER KYRIACOU and ARISTOS ARISTODEMOU.  The meeting was consensually recorded.  During this meeting, the Undercover Agent again described his involvement in various stock manipulation deals.  He also explained that he needed to move the proceeds of his market manipulation activities back to the United States.   In response, ARISTODEMOU and Co-Conspirator-1 advised the Undercover Agent of an investment opportunity in real estate.  They further explained to the Undercover Agent that this potential investment could facilitate the laundering of the proceeds of the market manipulation deals.

48.     On or about December 12, 2017, the Undercover Agent again met with Co-Conspirator-1 and the defendants PETER KYRIACOU and ARISTOS ARISTODEMOU in London.  The meeting was consensually recorded.  During this meeting, KYRIACOU, ARISTODEMOU and Co-Conspirator-1 suggested to the Undercover Agent the possibility of laundering the proceeds of the stock manipulation deals through the purchase and sale of art. They offered to introduce the Undercover Agent to the defendant MATTHEW GREEN, an owner

of an art gallery in London. ARISTODEMOU explained that the Undercover Agent could purchase a painting from GREEN using the proceeds of the stock manipulation deals and then later sell the painting to "clean the money." ARISTODEMOU further explained that the art business was "the only market that is unregulated," and that art was a profitable investment because of "money laundering."

49. On or about and between January 3, 2018 and January 19, 2018, the defendant ARISTOS ARISTODEMOU sent emails to the Undercover Agent, who was located in the Eastern District of New York, in which he suggested scheduling a meeting with the defendant MATTHEW GREEN to discuss the "nuts and bolts of the deal."

50. On or about February 5, 2018, the Undercover Agent met with the defendants PETER KYRIACOU, ARISTOS ARISTODEMOU and MATTHEW GREEN in London. The meeting was consensually recorded. During the meeting, the Undercover Agent once again explained his involvement in stock manipulation deals and the need to launder the proceeds of those deals. In response, KYRIACOU, ARISTODEMOU and GREEN then discussed how the Undercover Agent could purchase a Pablo Picasso painting from GREEN to launder the proceeds of the stock manipulation deals. Specifically, the Undercover Agent would purchase and then maintain ownership of the painting for a period of time and then GREEN would arrange for the resale of the painting. GREEN would then transfer proceeds of that sale back to the Undercover Agent through a bank account in the United States.

51. During the meeting, the defendant MATTHEW GREEN stated, in part, that it was important for him to make more than a five percent profit on the transaction so that he would not be asked why he was "in the money laundering business." GREEN further stated that he would address an invoice for the painting to a company that the Undercover Agent specified.

17

52.  On or about February 14, 2018, the Undercover Agent, while located in the Eastern District of New York, sent an email to the defendant ARISTOS ARISTODEMOU. The defendant PETER KYRIACOU and Co-Conspirator-1 were copied on the email. In the email, the Undercover Agent provided ARISTODEMOU with billing information for the purchase of the painting and requested a draft contract for the sale.

53.  On or about February 19, 2018, the defendant PETER KYRIACOU sent a WhatsApp message to the Undercover Agent attaching an invoice from Mayfair Fine Art Limited for a painting by Pablo Picasso entitled "Personnages, Painted 11 April 1965." The invoice listed the purchaser of the painting as one of the Undercover Agent's IBCs, and the purchase price as £6.7 million. The invoice contained wiring instructions for payment and stated that payment was due on or before March 6, 2018.

54.  On or about February 21, 2018, the defendant MATTHEW GREEN caused an email to be sent to an email address in the name of one of the Undercover Agent's IBCs. The email attached the invoice for the Picasso painting with an updated address for the Undercover Agent's IBC.

55.  Later that day, the defendant PETER KYRIACOU sent the Undercover Agent a screenshot via WhatsApp of a message from the defendant MATTHEW GREEN in which GREEN stated to KYRIACOU, in part, "[O]bviously because of the nature of this transaction we need to preserve a certain amount of anonymity which [the Undercover Agent] and I discussed and clarified at the Arts Club!"

E.    LOYAL BANK and LOYAL AGENCY

56.  In connection with the Belize Investigation, law enforcement agents learned from a cooperating witness ("CW-1"), an individual whose identity is known to the Grand

Jury, that from approximately 2011 to 2013 CW-1 laundered the proceeds of various market manipulation schemes through bank accounts at LOYAL BANK.

57.     On or about May 5, 2017, the Undercover Agent, while located in the Eastern District of New York, placed a consensually recorded call to the defendant ADRIAN BARON. During this call, the Undercover Agent expressed interest in opening corporate bank accounts in the names of his Belizean IBCs. BARON and the Undercover Agent agreed to meet at LOYAL BANK's office in Budapest, Hungary in June 2017 to further discuss the Undercover Agent's request.

58.     On or about June 14, 2017, the Undercover Agent met with the defendant ADRIAN BARON at LOYAL BANK's office in Budapest. The meeting was consensually recorded. During the meeting, the Undercover Agent explained that he was a U.S. citizen, and that he was a stock promoter involved in stock manipulation schemes. The Undercover Agent further explained to BARON that he was interested in opening multiple corporate bank accounts at LOYAL BANK. The Undercover Agent informed BARON that these accounts would be opened in the names of Belizean IBCs controlled by the Undercover Agent and that no U.S. citizens would appear on any of the account opening documents, despite the Undercover Agent being the true beneficial owner of the accounts. BARON responded that LOYAL BANK could open these accounts and provide debit cards linked to them. After this meeting, the Undercover Agent applied for a corporate bank account at LOYAL BANK in the name of one of his Belizean IBCs and with CS-1 acting as the nominee for the account. A "Loyal Bank Limited Foreign Account Tax Compliance Act (FATCA) Declaration Form" completed as part of the account opening application contained no reference to the Undercover Agent.

59.     On or about July 7, 2017, the Undercover Agent met with the defendants ADRIAN BARON and LINDA BULLOCK in Miami, Florida to further discuss the Undercover Agent's relationship with LOYAL BANK. The meeting was consensually recorded. During the meeting, the Undercover Agent described how his stock manipulation deals operated, including (1) the need to conceal from the SEC his true beneficial ownership of more than five percent of a company's stock through nominee brokerage accounts, and (2) the need to circumvent the IRS's reporting requirements under FATCA. Following BULLOCK's departure from the meeting, BARON joked that the corporate bank account at LOYAL BANK for which the Undercover Agent had applied had "no U.S. involvement that [he] could see," despite the Undercover Agent's representations to the contrary. The Undercover Agent also emphasized that he required LOYAL BANK's debit card service to provide kickbacks to U.S.-based brokers as part of his stock manipulation deals. BARON described the stock manipulation deals as "pump and dump" or "share ramping" schemes in which "stocks are pumped up by a lot of fake news and everyone sells out and the owners of those stocks are left with nothing."

60.     Following this meeting, the Undercover Agent requested that LOYAL BANK open five additional bank accounts in the name of five more Belizean IBCs controlled by the Undercover Agent. Again, the Undercover Agent's IBCs utilized Belizeans nominees. All six account applications contained identical business plans for each of the six IBCs. On or about and between July 14, 2017 and August 8, 2017, LOYAL BANK opened five of the six bank accounts requested by the Undercover Agent. Notwithstanding the Undercover Agent's statement that he would be the true beneficial owner of the accounts, at no time did LOYAL BANK request FATCA Information from the Undercover Agent.

61.     On or about July 21, 2017, the Undercover Agent emailed representatives of LOYAL AGENCY, including the defendant LINDA BULLOCK. In that email, the Undercover Agent inquired about the possibility of purchasing six IBCs incorporated in Saint Vincent and the Grenadines. On or about August 18, 2017, the Undercover Agent emailed representatives of LOYAL AGENCY, including the defendants ADRIAN BARON and LINDA BULLOCK, and advised them that he was purchasing the IBCs for the purpose of opening brokerage accounts in the name of the IBCs at BEAUFORT SECURITIES or a brokerage firm affiliated with LOYAL BANK. The Undercover Agent subsequently purchased six IBCs from LOYAL AGENCY, and LOYAL BANK then opened a corporate bank account for each IBC. At no time did LOYAL BANK request FATCA Information from the Undercover Agent for these accounts.

62.     On or about July 26, 2017, the Undercover Agent directed BEAUFORT SECURITIES to transfer approximately $95,000 from a brokerage account at BEAUFORT SECURITIES to a bank account he controlled at LOYAL BANK. These funds represented the proceeds of the sale of FTSE STOCK A by BEAUFORT SECURITIES on behalf of the Undercover Agent. BEAUFORT SECURITIES subsequently transferred the funds after receiving a letter from the defendant LINDA BULLOCK confirming the wire transfer details of the Undercover Agent's account at LOYAL BANK. The Undercover Agent separately transferred approximately $95,000 to bank accounts he controlled at LOYAL BANK.

63.     In or about and between October 2017 and December 2017, LOYAL BANK shipped 11 debit cards to CS-1 in Belize at the direction of the Undercover Agent. Each of these debit cards was linked to the 11 corporate bank accounts opened by the Undercover Agent at LOYAL BANK.

21

64.     On or about December 8, 2017, the Undercover Agent placed a consensually recorded call to the defendant LINDA BULLOCK. During the call, the Undercover Agent described his stock manipulation deals and again informed BULLOCK that he was the true beneficial owner of the bank accounts at LOYAL BANK. BULLOCK stated, in part, that she was aware that the accounts had a "nominee" and that the Undercover Agent was not listed as the true beneficial owner. The Undercover Agent also described to BULLOCK how LOYAL BANK's debit card service allowed him to provide kickbacks to corrupt stock brokers in the United States. Notwithstanding this conversation, LOYAL BANK continued to maintain the 11 bank accounts controlled by the Undercover Agent and, on or about January 30, 2018, LOYAL AGENCY renewed the six IBCs purchased by the Undercover Agent.

65.     On or about and between November 9, 2017 and February 22, 2018, the debit cards sent by LOYAL BANK to CS-1 at the direction of the Undercover Agent were used to withdraw approximately $130,000 from automated teller machines located in the Eastern District of New York.

COUNT ONE
(Conspiracy to Commit Securities Fraud)

66.     The allegations contained in paragraphs one through 65 are realleged and incorporated as if fully set forth in this paragraph.

67.     In or about and between March 2014 and February 2018, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants PANAYIOTIS KYRIACOU, also known as "Peter Kyriacou," ARVINSINGH CANAYE, also known as "Vinesh Canaye," BEAUFORT SECURITIES LTD and BEAUFORT MANAGEMENT SERVICES LTD, together with others, did knowingly and willfully conspire to use and employ one or more manipulative and deceptive devices and contrivances, contrary to

22

Rule 10b-5 of the Rules and Regulations of the United States Securities and Exchange Commission, Title 17, Code of Federal Regulations, Section 240.10b-5, by: (a) employing one or more devices, schemes and artifices to defraud; (b) making one or more untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaging in one or more acts, practices and courses of business which would and did operate as a fraud and deceit upon investors and potential investors in various U.S. publicly traded companies, in connection with the purchase and sale of investments in those publicly traded companies, directly and indirectly, by use of means and instrumentalities of interstate commerce and the mails, contrary to Title 15, United States Code, Sections 78j(b) and 78ff.

68.     In furtherance of the conspiracy and to effect its objects, within the Eastern District of New York and elsewhere, the defendants PETER KYRIACOU, VINESH CANAYE, BEAUFORT SECURITIES LTD and BEAUFORT MANAGEMENT SERVICES LTD, together with others, committed and caused to be committed, among others, the following:

OVERT ACTS

(a)     On or about September 16, 2016, during a telephone call between CS-1 and KYRIACOU, KYRIACOU agreed in principle to open brokerage accounts at BEAUFORT SECURITIES in the name of Belizean IBCs using nominee shareholders.

(b)     On or about October 21, 2016, during a telephone call between the Undercover Agent and KYRIACOU, KYRIACOU agreed to open brokerage accounts at BEAUFORT SECURITIES in the name of Belizean IBCs controlled by the Undercover Agent.

(c)     On or about November 30, 2016, KYRIACOU met with the Undercover Agent and recommended giving CS-1 power of attorney for the IBCs controlled by the Undercover Agent for the IBCs' brokerage accounts at BEAUFORT SECURITIES.

(d)     On or about January 13, 2017, KYRIACOU emailed CS-1 and confirmed that BEAUFORT SECURITIES had processed five brokerage account applications on behalf of CS-1.

(e)     On or about April 26, 2017, the Undercover Agent and KYRIACOU agreed to communicate using, among other methods, email addresses designed to hide the Undercover Agent's identity and WhatsApp to facilitate the execution of manipulative stock trades.

(f)     On or about July 6, 2017, KYRIACOU sent an email to the Undercover Agent in which he introduced the Undercover Agent to CANAYE.

(g)     On or about October 17, 2017, CANAYE informed the Undercover Agent that he would personally sign documents on behalf of the GBCs created for the Undercover Agent by BEAUFORT MANAGEMENT and that the Undercover Agent's name would not appear on any company documents.

(h)     In or about December 2017, CANAYE and BEAUFORT MANAGEMENT created six GBCs for the Undercover Agent.

(i)     On or about January 31, 2018, KYRIACOU caused BEAUFORT SECURITIES to execute a match trade of HDVW's stock.

(Title 18, United States Code, Sections 371 and 3551 et seq.)

## COUNT TWO
### (Money Laundering Conspiracy – The Beaufort and Loyal Bank Scheme)

69.     The allegations contained in paragraphs one through 65 are realleged and incorporated as if fully set forth in this paragraph.

70.     In or about and between January 2011 and February 2018, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants PANAYIOTIS KYRIACOU, also known as "Peter Kyriacou," ARVINSINGH CANAYE, also known as "Vinesh Canaye," ADRIAN BARON, LINDA BULLOCK, BEAUFORT SECURITIES LTD, BEAUFORT MANAGEMENT SERVICES LTD, LOYAL BANK LTD and LOYAL AGENCY AND TRUST CORP., together with others, did knowingly and intentionally conspire:

(a)     to conduct financial transactions affecting interstate and foreign commerce, specifically the interstate and foreign wire transfer of money and securities, which transactions involved property represented by a person at the direction of, and with the approval of, a federal official authorized to investigate violations of Title 18, United States Code, Section 1956, to be the proceeds of specified unlawful activity, specifically, fraud in the sale of securities, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, (i) with the intent to promote the carrying on of such specified unlawful activity, contrary to Title 18, United States Code, Section 1956(a)(3)(A), (ii) to conceal and disguise the nature, location, source, ownership and control of property believed to be the proceeds of the specified unlawful activity, contrary to Title 18, United States Code, Section 1956(a)(3)(B), and (iii) to avoid a transaction reporting requirement under state and federal law, contrary to Title 18, United States Code, Section 1956(a)(3)(C); and

25

(b)     to transport, transmit and transfer a monetary instrument and funds from a place in the United States to and through a place outside the United States and to a place in the United States from and through a place outside the United States, (i) with the intent to promote the carrying on of specified unlawful activity, contrary to Title 18, United States Code, Section 1956(a)(2)(A), (ii) to conceal and disguise the nature, location, source, ownership and control of the proceeds of the specified unlawful activity, knowing that the monetary instrument and funds involved in the transportation, transmission and transfer would represent the proceeds of some form of unlawful activity and knowing that such transportation, transmission and transfer would be designed in whole and in part to conceal and disguise the nature, location, source, ownership and control of the proceeds of the specified unlawful activity, contrary to Title 18, United States Code, Section 1956(a)(2)(B)(i), and (iii) to avoid a transaction reporting requirement under state and federal law, knowing that the monetary instrument and funds involved in the transportation, transmission and transfer would represent the proceeds of some form of unlawful activity and knowing that such transportation, transmission and transfer would be designed in whole and in part to conceal and disguise the nature, location, source, ownership and control of the proceeds of the specified unlawful activity, contrary to Title 18, United States Code, Section 1956(a)(2)(B)(ii).

(Title 18, United States Code, Sections 1956(h) and 3551 et seq.)

### COUNT THREE
(Money Laundering Conspiracy – The Real Estate/Art Scheme)

71.     The allegations contained in paragraphs one through 65 are realleged and incorporated as if fully set forth in this paragraph.

72.     In or about and between October 2017 and February 2018, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants

26

PANAYIOTIS KYRIACOU, also known as "Peter Kyriacou," ARISTOS ARISTODEMOU and MATTHEW GREEN, together with others, did knowingly and intentionally conspire to conduct financial transactions affecting interstate and foreign commerce, specifically the interstate wire transfer of money and securities derived from the purchase and sale of real estate and art, which transactions involved property represented by a person at the direction of, and with the approval of, a federal official authorized to investigate violations of Title 18, United States Code, Section 1956, to be the proceeds of specified unlawful activity, specifically, fraud in the sale of securities, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, (i) with the intent to promote the carrying on of such specified unlawful activity, contrary to Title 18, United States Code, Section 1956(a)(3)(A), (ii) to conceal and disguise the nature, location, source, ownership and control of property believed to be the proceeds of the specified unlawful activity, contrary to Title 18, United States Code, Section 1956(a)(3)(B), and (iii) to avoid a transaction reporting requirement under state and federal law, contrary to Title 18, United States Code, Section 1956(a)(3)(C).

(Title 18, United States Code, Sections 1956(h) and 3551 et seq.)

## COUNT FOUR
### (Conspiracy to Defraud the United States)

73. The allegations contained in paragraphs one through 65 are realleged and incorporated as though fully set forth in this paragraph.

74. In or about and between August 2016 and February 2018, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants PANAYIOTIS KYRIACOU, also known as "Peter Kyriacou," and ARVINSINGH CANAYE, also known as "Vinesh Canaye," together with others, did knowingly and willfully conspire to defraud the United States by impeding, impairing, obstructing and defeating the lawful

27

governmental functions of the IRS in the ascertainment, computation, assessment and collection

of revenue, specifically, by failing to comply with FATCA.

75.     In furtherance of the conspiracy and to effect its objects, within the Eastern

District of New York and elsewhere, the defendants PETER KYRIACOU and VINESH

CANAYE, together with others, committed and caused to be committed, among others, the

following:

## OVERT ACTS

(a)     On or about November 30, 2016, KYRIACOU and the Undercover

Agent discussed the Undercover Agent's account opening documents for his brokerage accounts

at BEAUFORT SECURITIES, and KYRIACOU caused those documents to be provided to

Compliance Officer-1.

(b)     On or about April 26, 2017, KYRIACOU told the Undercover

Agent, in part, that the Undercover Agent's name would not appear on any of his brokerage

account documentation at BEAUFORT SECURITIES.

(c)     On or about October 17, 2017, CANAYE told the Undercover

Agent, in part, that CANAYE would personally sign documents on behalf of the Undercover

Agent's GBCs and that the Undercover Agent's name would not appear on GBC documentation.

(d)     On or about November 29, 2017, CANAYE sent an email to CS-1

that attached an invoice for six GBCs purchased by the Undercover Agent.

(e)     On or about February 8, 2018, an employee of BEAUFORT

MANAGEMENT emailed CS-1, with CANAYE copied, and requested that CS-1 sign

28

documentation related to the opening of brokerage accounts in the name of six GBCs opened by BEAUFORT MANAGEMENT.

(Title 18, United States Code, Sections 371 and 3551 et seq.)

COUNT FIVE
(Conspiracy to Defraud the United States)

76.     The allegations contained in paragraphs one through 65 are realleged and incorporated as though fully set forth in this paragraph.

77.     In or about and between May 2017 and February 2018, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants ADRIAN BARON and LINDA BULLOCK, together with others, did knowingly and willfully conspire to defraud the United States by impeding, impairing, obstructing and defeating the lawful governmental functions of the IRS in the ascertainment, computation, assessment and collection of revenue, specifically, by failing to comply with FATCA.

78.     In furtherance of the conspiracy and to effect its objects, within the Eastern District of New York and elsewhere, the defendants ADRIAN BARON and LINDA BULLOCK, together with others, committed and caused to be committed, among others, the following:

OVERT ACTS

(a)     During a meeting on or about July 7, 2017, in Miami, Florida between BARON and the Undercover Agent, BARON stated, in part, that LOYAL BANK would not submit a FATCA declaration to regulators unless the paperwork indicated "obvious" "U.S. involvement."

(b)     On or about July 14, 2017, BULLOCK sent an email to the Undercover Agent advising him that a bank account for the Undercover Agent's IBC was

29

successfully opened and that "[a]ccount credentials will be communicated on Monday to the respective authorized person, [the Undercover Agent's nominee]."

        (c)     On or about December 4, 2017, BULLOCK sent an email to the Undercover Agent advising him that she had contacted LOYAL BANK's customer service department and directed it to assist the Undercover Agent in gaining access to his online bank accounts.

        (d)     On or about December 8, 2017, during a call with the Undercover Agent, BULLOCK acknowledged that the Undercover Agent was the beneficial owner of the bank accounts at LOYAL BANK.  BULLOCK also stated, in part, that the Undercover Agent's accounts listed a nominee as the beneficial owner.

        (e)     On or about January 30, 2018, LOYAL AGENCY renewed six IBCs purchased by the Undercover Agent.

     (Title 18, United States Code, Sections 371 and 3551 et seq.)

## CRIMINAL FORFEITURE ALLEGATION
## AS TO COUNT ONE

       79.     The United States hereby gives notice to the defendants charged in Count One that, upon their conviction of such offense, the government will seek forfeiture, in accordance with Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), which require any person convicted of such offense to forfeit any property, real or personal, constituting or derived from, proceeds obtained directly or indirectly as a result of such offense.

       80.     If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

        (a)     cannot be located upon the exercise of due diligence;

(b)     has been transferred or sold to, or deposited with, a third party;

(c)     has been placed beyond the jurisdiction of the court;

(d)     has been substantially diminished in value; or

(e)     has been commingled with other property which cannot be divided

without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to

seek forfeiture of any other property of the defendants up to the value of the forfeitable property

described in this forfeiture allegation.

(Title 18, United States Code, Section 981(a)(1)(C); Title 21, United States Code,

Section 853(p); Title 28, United States Code, Section 2461(c))

## CRIMINAL FORFEITURE ALLEGATION
## AS TO COUNTS TWO AND THREE

81.     The United States hereby gives notice to the defendants charged in Counts

Two and Three that, upon their conviction of either offense, the government will seek forfeiture in

accordance with Title 18, United States Code, Section 982(a)(1), which requires any person

convicted of such offenses to forfeit any property, real or personal, involved in such offenses, or

any property traceable to such property.

82.     If any of the above-described forfeitable property, as a result of any act or

omission of the defendants:

(a)     cannot be located upon the exercise of due diligence;

(b)     has been transferred or sold to, or deposited with, a third party;

(c)     has been placed beyond the jurisdiction of the court;

(d)     has been substantially diminished in value; or

31

(e)        has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, 982(b)(1), to seek forfeiture of any other property of the defendants up to the value of the forfeitable property described in this forfeiture allegation.

(Title 18, United States Code, Sections 982(a)(1) and 982(b)(1); Title 21, United States Code, Section 853(p))

A TRUE BILL

_____
FOREPERSON

_____
RICHARD P. DONOGHUE
UNITED STATES ATTORNEY
EASTERN DISTRICT OF NEW YORK

F. # 2017R01904

FORM DBD-34
JUN. 85

No.

# UNITED STATES DISTRICT COURT

## EASTERN *District of* NEW YORK

## CRIMINAL DIVISION

## THE UNITED STATES OF AMERICA

*vs.*

*PANAYIOTIS KYRIACOU,*
*also known as "Peter Kyriacou," et al.,*

Defendants.

# SUPERSEDING INDICTMENT

(T. 18, U.S.C., §§ 371, 981(a)(1)(C), 982(a)(1), 982(b)(1), 1956(h) and 3551
*et seq.*; T. 21, U.S.C., § 853(p); T. 28, U.S.C., § 2461(c))

*A true bill.*

_____  3/20/18
*Foreperson*

*Filed in open court this* _____ *day,*

*of* _____ *A.D. 20* _____

_____
*Clerk*

*Bail, $* _____

_____

*Jacquelyn M. Kasulis, Michael T. Keilty, David Gopstein*
*Assistant U.S. Attorneys / 718-254-6103/7528/6153*